Marshall Kenneth FLOWERS, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 05–1163C.

United States Court of Federal Claims.

March 1, 2007.

Marshall K. Flowers, Adelaide, Australia, pro se.

Meredyth D. Cohen, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

SWEENEY, Judge.

Before the court are defendant's "Motion to Dismiss or, in the Alternative, for Judgment Upon the Administrative Record, in part, and for Summary Judgment, in part" and plaintiff's motion for discovery pursuant to Rule 56(f) of the Rules of the United States Court of Federal Claims ("RCFC"). The underlying case concerns claims brought by a former sergeant major in the United States Army ("Army") alleging, *inter alia,* entitlement to backpay, declaratory relief for involuntary retirement from the Army, compensation for a Fifth Amendment taking of property, and monetary relief for damage to household goods. For the reasons stated below, plaintiff's motion to conduct discovery is denied, and defendant's motion for summary judgment on Counts V and VI of plaintiff's amended complaint is granted.

## I. BACKGROUND

### A. Factual Background

The factual background to this case covers many years and numerous lawsuits. Because the background bears on the claims plaintiff asserts in this court, setting forth the details of those suits is necessary. Plaintiff, Marshall K. Flowers, entered the Army on April 30, 1971, in Jacksonville, Florida, Administrative Record ("AR")[1] 570, and was

---

1. Defendant filed the AR, comprising four volumes and exceeding 1,280 pages, with the court on March 7, 2006, and March 22, 2006. Arguing that the AR filed by the defendant was incomplete, plaintiff filed a motion to supplement the AR. Plaintiff insisted that the AR filed by defendant omitted pages from an appeal plaintiff had filed with the Army on August 31, 1998. *See infra* pp. 617–21 (describing the military investigations, hearings, and appeals detailed in the AR). While defendant disagreed with the factual and legal assertions advanced in plaintiff's motion to supplement, defendant did not oppose plaintiff's motion and reserved the right to respond to the assertions. This court granted plaintiff's motion, and plaintiff supplemented the AR on September 19, 2006. Plaintiff's supplement consists of 58 pages and is a copy of the appeal plaintiff states he filed with the Army on August 31, 1998. *Id.*

honorably discharged on February 1, 2000. *Id.* at 1155–57 (noting that plaintiff's length of service in the Army totaled twenty-eight years, eight months, and one day); *see also id.* at 19. When plaintiff's service ended, he was serving with the 25th Infantry Division as a food service sergeant major. *Id.* at 908, 1031. During his service in the Army, plaintiff received several commendations for his outstanding performance. *See id.* at 1159–83.

However, because of unusual behavior by plaintiff, the Army began investigating him for theft. Specifically, plaintiff returned items on several occasions to the Army and Air Force Exchange Service ("AAFES") and Navy Exchange ("NEX") (collectively "exchange systems") between September 1996 and December 1997 without receipts and in exchange for cash.[2] *See id.* at 661–63. On December 11, 1997, the security office at the AAFES Main Exchange notified the Army's Criminal Investigation Command ("CID") that plaintiff and his wife had returned approximately $9,377.53 worth of merchandise for cash refunds at the exchange systems during the above-stated period. *Id.* at 662. A security officer at the AAFES on December 13, 1997, observed plaintiff walk into the AAFES without merchandise, remove a computer hard drive from its original box, *id.,* exit the AAFES without paying for the merchandise, and then re-enter with a "wrinkled 'even exchange form,' at which time [plaintiff] was detained by the AAFES security." *Id.* at 654–55. Additionally, an employee in the loss prevention division at the NEX stated that plaintiff had returned many items without a receipt, and as a result, the NEX began monitoring plaintiff.[3] *Id.* at 662–63. The same employee recalled that on December 7, 1997, she observed plaintiff via video surveillance remove a portable television from its original box and place it into his pocket. *Id.* at 663.

On December 18, 1997, the Army authorized a search warrant for plaintiff's residence. *Id.* at 677–80 (Search and Seizure Authorization and supporting affidavit); *see also id.* at 663. The search yielded several duplicate and unopened electronic, computer, and other high-value items. *See id.* at 663–66. The evidence seized during the search included "seven boxes and one plastic bag containing numerous video games, computer software and electronic items."[4] *Id.* at 665. The Army also found and seized fourteen exchange sales receipts, two of which appeared authentic, one of which "contained white out over the area which described the item purchased," and the remainder of which "had the item description blank." *Id.* at 665–66.

The CID, in a report dated March 27, 1998, determined that probable cause existed to believe that plaintiff had conspired with his wife to steal in excess of $27,300 from the exchange systems and to defraud the exchange systems by returning stolen property for cash. *Id.* at 661–74. As a result, on April 9, 1998, plaintiff's commander preferred charges against plaintiff for forty-two counts of larceny under the Uniform Code of Military Justice ("UCMJ").[5] *Id.* at 686–91.

---

**2.** This court's role is not to address the validity of the past larceny charges against plaintiff. This court's role is to simply provide a factual background of plaintiff's military record as it relates to the pending proceeding.

**3.** The NEX in Pearl Harbor apparently systematically tracks any merchandise purchased costing more than $250.00. AR 663. The database retains sales information for up to 90 days regarding such purchases. *Id.* On December 15, 1997, an employee at the NEX searched the database for the previous 90 days, dating back to September 15, 1997, and discovered that neither plaintiff nor his wife had purchased any item in excess of $250.00. *Id.*

**4.** Property seized from the residence was valued at $17,923.59, AR 667, and included: seventy-four Sony Playstation games, two computer central processing units, eight computer software packages, two Kenwood portable compact disc players, two digital video cameras, eleven Nintendo 64 games, a Canon EOS Rebel digital camera, an RCA camcorder, a Maxtor hard drive, eleven JVC digital video cassettes, and three Casio portable televisions. *Id.* at 666–67. Some of the items had AAFES or NEX price tags. *Id.*

**5.** The UCMJ is codified at 10 U.S.C. §§ 801–946 (2000). Each section of the United States Code within the UCMJ is identified as an individually numbered Article, beginning with Article 1 corresponding to 10 U.S.C. § 801.

Article 32 of the UCMJ requires an investigative proceeding before a court-martial may be convened.[6] 10 U.S.C. § 832. The purpose of an Article 32 investigation is to investigate specific charges preferred against the accused. *See* Lieutenant Colonel Denise R. Lind, *Media Rights of Access to Proceedings, Information, and Participants in Military Criminal Cases,* 163 Mil. L.Rev. 1, 42 (2000). A neutral investigating officer conducts a hearing and decides the witnesses to call and the evidence to consider. *See* 10 U.S.C. § 832; Lind, *supra,* at 43. At the hearing, the "accused has the right to be represented in his defense." *See* 10 U.S.C. § 838(b)(1). The government is not required to be represented at the proceeding.[7] Lind, *supra,* at 43. Finally, the accused has the opportunity to cross-examine witnesses and to confront the evidence proffered, and the investigating officer is required to examine available witnesses requested by the accused. 10 U.S.C. § 832(b).

For plaintiff's Article 32 investigative proceeding, Major Timothy M. Ryan served as the investigating officer, and then-Captain (now Major) John N. Ohlweiler served as government counsel. *See* AR 227. Relating to the investigation, the Army issued a subpoena to two financial institutions: First Hawaiian Bank ("First Hawaiian") and Fort Jackson Federal Credit Union ("Fort Jackson FCU"). *See Flowers v. First Hawaiian Bank,* 295 F.Supp.2d 1130, 1134 (D.Haw. 2003); *see also* AR 695–96 (letters from First Hawaiian and Fort Jackson FCU providing information regarding plaintiff's and his

wife's accounts). On June 19, 1998, a subpoena was issued to First Hawaiian requesting all bank records associated with a specific account belonging to plaintiff and his wife. *Flowers,* 295 F.Supp.2d at 1134. The subpoena stated that it was issued for an Article 32 hearing. *Id.* First Hawaiian notified plaintiff of the subpoena by a letter dated July 1, 1998.[8] *Id.* On June 24, 1998, Major Ohlweiler issued a subpoena relating to a general court-martial to Fort Jackson FCU, seeking bank account information for an account belonging to plaintiff and his wife. AR 694; *Flowers,* 295 F.Supp.2d at 1134. Major Ohlweiler, who signed both subpoenas, testified at a deposition that the subpoena served on Fort Jackson FCU erroneously stated that the subpoena was for a general court-martial, rather an Article 32 hearing. *Flowers,* 295 F.Supp.2d at 1134.

On June 25, 1998, the Army conducted an Article 32 hearing pursuant to the UCMJ. *See* AR 227–39 (transcript of proceedings). The transcript of the Article 32 proceeding reflects that several individuals were present, including: Investigating Officer Major Timothy M. Ryan; Government Counsel Captain John N. Ohlweiler; Senior Defense Counsel Major Denise Lind;[9] Assistant Defense Counsel Captain Peter Graff; Civilian Counsel Charles W. Gittins; and plaintiff. *Id.* at 227 (noting that plaintiff was represented by both military and civilian counsel); *see also id.* at 227–39 (testifying at the hearing were several individuals involved in the criminal investigation).[10] Major Ryan completed the

---

6.  Title 10 U.S.C. § 832(a) provides:
    No charge or specification may be referred to a general court-martial for trial until a thorough and impartial investigation of all the matters set forth therein has been made. This investigation shall include inquiry as to the truth of the matter set forth in the charges, consideration of the form of charges, and a recommendation as to the disposition which should be made of the case in the interest of justice and discipline.

7.  In comparison, at a court-martial, the government is represented by a lawyer, "trial counsel," who is the military prosecutor. 10 U.S.C. § 838(a) ("The trial counsel of a general or special court-martial shall prosecute in the name of the United States, and shall, under the direction of the court, prepare the record of the proceedings.").

8.  *See infra* note 18.

9.  It appears that plaintiff's Senior Defense Counsel is the author of the 2000 Military Law Review article cited above.

10.  The following individuals testified at the Article 32 hearing: (1) Meegan P. Huffman, Loss Prevention, NEX, Pearl Harbor, Hawaii; (2) Felisa M. Plank, AAFES Security, Schofield Barracks, Hawaii; (3) Specialist Cynthia Jeans, Military Police Investigator, 58th Military Police Company, Schofield Barracks, Hawaii; (4) Specialist Williams, Military Police Investigator, 58th Military Police Company, Schofield Barracks, Hawaii; (5) Sergeant First Class Freddie Florenz, 25th Military Police Company, Schofield Barracks; Hawaii; (6) Sergeant Shannon Lehr, Fort Shafter Military Police Company, Fort

Article 32 investigation report on July 16, 1998, *id.* at 712–22, and determined that sufficient evidence existed "to reasonably conclude" that plaintiff committed "violations of UCMJ Article 121, Larceny, regarding 16 of 42" charges. *Id.* at 715. Accordingly, Major Ryan recommended trial by general court-martial for violations of the UCMJ. *Id.*

On July 26, 1998, plaintiff signed an agreement for alternative disposition of charges, accepting nonjudicial punishment ("NJP")[11] and retirement from service. *See id.* at 708; *see also id.* at 5, 571. In exchange for signing the agreement, plaintiff's commander agreed to withdraw the court-martial charges against him and return specific items that had been seized from plaintiff's quarters. *See id.* at 708; *see also id.* at 5, 706 (withdrawing and dismissing the forty-two charges against plaintiff on July 29, 1998). Plaintiff, plaintiff's counsel, and Colonel Eddie Coleman signed a "Memorandum of Agreement for Alternative Disposition of Court–Martial Charges" in August 1998, which superceded the July 26, 1998 agreement. *See id.* at 738. The thrust of this memorandum is the same as the July 26, 1998 agreement, in that it provides for the charges to be withdrawn and requires that plaintiff not participate in any retirement ceremony. *Id.* On August 28, 1998, plaintiff accepted his punishment under the Article 15 proceedings.[12] *Id.* at 830–31; *see also id.* at 832. Plaintiff's NJP was imposed and consisted of a forfeiture of $1,788 per month for two months in addition to a formal written reprimand. *Id.* at 830; *see also id.* at 88, 739, 741. Pursuant to the agreement, plain-

tiff applied for voluntary retirement. *See id.* at 790. Plaintiff subsequently filed an Article 15 appeal on August 31, 1998, claiming that his punishment was "unjust, prejudicial and inappropriate." *Id.* at 591. The appeal was denied by Major General James T. Hill. *Id.* at 832.

For reasons not fully explained in the available record, charges again were filed against plaintiff and that for the first time named his wife as an accomplice. *Id.* at 572, 829 (stating, on a routing and transmittal slip dated April 5, 1999, that charges were "re-preferred after [illegible] did not put in [plaintiff's] retirement"), 804–06 (a "charge sheet," dated November 13, 1998, noting that plaintiff and his wife had conspired to commit larceny). Another Article 32 hearing was held on November 25, 1998,[13] and the investigating officer completed her report on March 29, 1999. *Id.* at 815–27. The officer determined that the evidence against plaintiff and his wife did not support a finding beyond a reasonable doubt, *id.* at 820, and the Army withdrew the charges on June 28, 1999.[14] *Id.* at 884. In May 1999, the Army imposed a bar to reenlistment. *Id.* at 871. Plaintiff appealed the bar, but commanding officers advised that the bar to reenlistment remain in place. *Id.* at 858–66. Plaintiff's retirement was to become effective on December 31, 1999, but the Army allowed plaintiff to remain in service until February 1, 2000. *Id.* at 572, 851–52, 903, 1155.

In addition to containing documents that describe the events surrounding plaintiff's retirement, the AR is replete with evaluations of plaintiff's performance,[15] *id.* at 1012–

---

Shafter, Hawaii; and (7) Sergeant Angela Ebert, Special Agent, Hawaii Field Office, Criminal Investigation Division. AR 768–80.

11. Article 15 of the UCMJ provides for NJP, which can be awarded by a commanding officer or officer in charge to members of his or her command for minor disciplinary offenses. *See* 10 U.S.C. § 815.

12. On August 17, 1998, plaintiff initially, against his defense counsel's strong objections, demanded trial by court-martial. *See* AR 701–02.

13. The individuals present at the Article 32 hearing included: Investigating Officer Captain Kimberly J. Huhta; Trial Counsel Captain John Ohl-

weiler; Detailed Defense Counsel Major Claes Lewenhaupt; and plaintiff. AR 822. At the hearing, Defense Counsel requested a psychiatric expert, but Trial Counsel objected because the "sanity board found the accused competent." *Id.* at 822–23.

14. Although the Army withdrew the charges of larceny and conspiracy against plaintiff and his wife, the withdrawal did not result in nullifying the earlier charges filed solely against plaintiff. To the contrary, plaintiff's NJP remained binding.

15. The AR contains numerous evaluations of plaintiff's performance spanning his service in the Army. *See generally* AR 974–1041 (copies of

41, including copies of his Noncommissioned Officer Evaluation Reports ("NCOER").[16] *Id.* at 1029–41 (NCOERs rating plaintiff's performance from June 1988 to August 1999). In September 1998, an NCOER covering the period of July 1997 to August 1998 reflected plaintiff's ratings of "excellence." *Id.* at 1037–38. However, Colonel Harrison Lobdell, III, filed a statement of "non-concurrence," indicating that the NCOER was inaccurate because plaintiff was stealing from the exchange systems during the rated period. *Id.* at 1039. On October 7, 1999, plaintiff requested a commander's inquiry into the September 28, 1998 NCOER, citing "unfair, prejudicial, un-substantiated [sic] information." *Id.* at 557. Plaintiff alleged that because he was not provided "a clear job description, rating scheme, and performance counseling," a "fair and un-bias [sic] assessment" of his performance could not be conducted. *Id.* Plaintiff further alleged that "prejudice, bias, and undue command influence prevailed in denying me professional growth, counseling, and a true and reasonable assessment of my military potential." *Id.* On December 6, 1999, Colonel Eddie Coleman directed Major Thomas Guarnaccia to perform the commander's inquiry into the NCOER that plaintiff requested. *Id.* at 560. Upon conducting an investigation into the circumstances of plaintiff's NCOER, Major Guarnaccia found that "no regulatory violations" had occurred, and the "allegations made against individuals [by plaintiff were] not substantiated or relevant to this inquiry." *Id.* at 562. Major Guarnaccia noted that the NCOER was "written within the prescribed regulation," and the statements in the NCOER were "honest and supportive especially due to the relationship between all involved." *Id.*

In May 2002, plaintiff filed an application for correction of his military records with the Army Board for Correction of Military Rec-

ords ("ABCMR" or "Correction Board"). *Id.* at 578–908. In a July 25, 2002 memorandum, *id.* at 569–75, the Correction Board determined that plaintiff failed to submit evidence showing that the record was "in error or unjust." *Id.* at 573. The Correction Board further found that the NCOER was "administratively correct," that plaintiff was not denied effective assistance of counsel, and that plaintiff had the opportunity to demand trial by court-martial but instead accepted NJP. *Id.* at 574. The Correction Board determined in its "review of this case that there was no error or injustice in the imposition of the applicant's NJP and [Memorandum of Reprimand]." *Id.* at 7. As will be explained in more detail below, because the United States Court of Appeals for the Ninth Circuit ("Ninth Circuit") held that a subpoena issued to one of plaintiff's financial institutions was unlawful,[17] the Correction Board reviewed only that evidence compiled before the subpoena was issued. *Id.* The Correction Board noted that the evidence, namely the statements provided by exchange systems' personnel and the items seized from plaintiff's quarters, "was so overwhelming that there is no doubt that there was sufficient evidence in which to prefer court-martial charges." *Id.* As such, the Correction Board concluded that while error occurred because the subpoena was "erroneously issued," it "did not prejudice the substantial rights of the applicant." *Id.*

On July 30, 2002, plaintiff filed another application with the ABCMR, *id.* at 544–49, alleging that the NCOER was "prejudicial and resulted from prejudices, failure to follow regulations and improper and unsupported allegation of wrong doing [sic]." *Id.* at 544. On January 30, 2003, the ABCMR denied plaintiff's request for correction of his military records. *Id.* at 536–39. On May 31, 2003, plaintiff appealed the Correction Board's decisions of July 25, 2002, and Janu-

---

evaluations beginning in September 1972 until August 1999). These evaluations include: the "Enlisted Efficiency Report," *see, e.g., id.* at 974, the "Senior Enlisted Evaluation Report," *see, e.g., id.* at 980–81, and the NCOER, *see, e.g., id.* at 1012.

16. An NCOER states the servicemember's title, duties, "areas of special emphasis," and "ap-

pointed duties," and requires the rater to judge the Noncommissioned Officer's values and performance of responsibilities. *See, e.g.,* AR 1037–38.

17. *See infra* Part I.B (discussing *Flowers v. First Hawaiian Bank,* 295 F.3d 966 (9th Cir.2002), which held that subpoenas are not authorized in Article 32 investigations).

ary 30, 2003, in light of the Ninth Circuit's July 2, 2002 decision that the subpoena was unlawfully issued. *Id.* at 9–533 (plaintiff's application, statement, and exhibits). The ABCMR denied the appeal on March 30, 2004, *id.* at 2–8, describing the evidence considered and stating that the "evidence presented [did] not demonstrate the existence of a probable error or injustice." *Id.* at 8.

### B. Right to Financial Privacy Act Lawsuits

In May 1999, plaintiff and his wife ("the Flowerses") filed suit in the United States District Court for the District of Hawaii ("U.S. District Court of Hawaii") against First Hawaiian under the Right to Financial Privacy Act ("RFPA") [18] after First Hawaiian provided plaintiff's financial records to the government pursuant to the subpoena.[19] *Flowers v. First Hawaiian Bank,* 85 F.Supp.2d 993 (D.Haw.2000); *see also Flowers,* 295 F.3d at 969–71 (providing a thorough procedural summary of the lawsuits and appeals regarding the subpoena). The U.S. District Court of Hawaii granted First Hawaiian's motion for judgment on the pleadings, finding that an exemption in the RFPA protected the bank from liability.[20] *See Flowers,* 85 F.Supp.2d at 994–95. The U.S. District Court of Hawaii also denied the Flowerses' motion to amend the complaint to add the Army as a defendant and to change the complaint's identification of Captain Ohl-

weiler from "trial counsel" to "government counsel." *Id.*

On July 2, 2002, the Ninth Circuit, in reversing and remanding the ruling of the district court, held that "[b]ecause subpoenas are not authorized in Article 32 proceedings, the subpoena was not lawfully issued." *See Flowers,* 295 F.3d at 969. Further, the Ninth Circuit held that the exception provided in § 3413(e) did not apply to First Hawaiian, *id.* at 971–76, and the district court erred in denying the Flowerses' motion for leave to amend the complaint to add the Army as a defendant and "to change the description in their complaint of Captain Ohlweiler from 'trial counsel' to 'government counsel.'" *Id.* at 976–77.

Upon remand, the U.S. District Court of Hawaii consolidated the case against First Hawaiian with a similar case brought by the Flowerses against Fort Jackson FCU. *Flowers,* 289 F.Supp.2d at 1216. The U.S. District Court of Hawaii dismissed the Flowerses' claims for damages against the federal government on *Feres* doctrine grounds. *Id.* (citing *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950)). The *Feres* doctrine originally barred negligence claims against the government by military personnel under the Federal Tort Claims Act. *Flowers,* 289 F.Supp.2d at 1216 (discussing the *Feres* doctrine). However, the U.S. District Court of Hawaii noted that the *Feres* doctrine had been extended to apply in many

---

**18.** The Right to Financial Privacy Act of 1978 is codified at 12 U.S.C. § 3401–3422 (2004). The RFPA generally "accords customers of banks and similar financial institutions certain rights to be notified of and to challenge in court administrative subpoenas of financial records in the possession of the banks." *SEC v. Jerry T. O'Brien, Inc.,* 467 U.S. 735, 745, 104 S.Ct. 2720, 81 L.Ed.2d 615 (1984). "Section 3402, in conjunction with sections 3404–3408, requires notice to be given the individual when a federal agency seeks access to that individual's records, and an opportunity is required to be provided for that individual to challenge the requested disclosure." *Neece v. IRS,* 922 F.2d 573, 575 (10th Cir.1990). While First Hawaiian notified plaintiff of the subpoena, the RFPA requires that the government authority issuing the subpoena provide the notice. 12 U.S.C. § 3407(2). The Army never issued such a notice. *Flowers,* 295 F.3d at 975 n. 2.

**19.** The Flowerses also filed suit against Fort Jackson FCU on the same grounds. *Flowers v.*

*First Hawaiian Bank,* 289 F.Supp.2d 1213, 1216 & n. 2 (D.Haw.2003) (referring to the Flowerses' claim against Fort Jackson FCU and stating that when Fort Jackson FCU consented to personal jurisdiction in Hawaii, the claims against Fort Jackson FCU and First Hawaiian were consolidated).

**20.** The U.S. District Court of Hawaii found that 12 U.S.C. § 3413(e) applied to First Hawaiian, which meant that First Hawaiian did not have to provide notice to the customer or otherwise comply with the notice provisions in the RFPA. *See Flowers,* 85 F.Supp.2d at 994–95.

The RFPA at 12 U.S.C. § 3413(e) provides:
Nothing in this chapter shall apply when financial records are sought by a Government authority under the Federal Rules of Civil or Criminal Procedure or comparable rules of other courts in connection with litigation to which the Government authority and the customer are parties.

other contexts. *Id.* at 1216–17 (citing, for example, *Mollnow v. Carlton,* 716 F.2d 627, 628 (9th Cir.1983) (holding that the *Feres* doctrine bars claims by military personnel against the government for intentional torts); *United States v. Stanley,* 483 U.S. 669, 680–81, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987) (holding that the *Feres* doctrine bars claims by military personnel for damages incident to service); and *Lutz v. Secretary of the Air Force,* 944 F.2d 1477, 1480–81 (9th Cir.1991) (holding that the *Feres* doctrine bars suits between military members based on injuries sustained incident to service)). Based on the reasoning other courts had applied in extending the *Feres* doctrine, the U.S. District Court of Hawaii concluded that *Feres* barred the Flowerses' RFPA claims for damages against the government. 289 F.Supp.2d at 1216–20. Although this ruling dismissed the claims against the government, the claims against First Hawaiian and Fort Jackson FCU required adjudication. *Id.*

In December 2003, the U.S. District Court of Hawaii resolved the remaining claims. *Flowers,* 295 F.Supp.2d 1130. The Court dismissed all claims against Fort Jackson FCU, finding that Fort Jackson FCU had no "reason to know that the subpoena might have been improper." *Id.* at 1137. Unlike the subpoena issued to First Hawaiian, Fort Jackson FCU had been served with a general court-martial subpoena. *Id.* The U.S. District Court of Hawaii found that the subpoena fit "squarely within the 'litigation exception' to the RFPA under 12 U.S.C. § 3413(e)." *Id.* The Court then found in favor of the Flowerses after First Hawaiian essentially admitted to violating the RFPA,[21] and awarded the Flowerses $200.[22] *Id.* at

1141. The Flowerses appealed, and the Ninth Circuit affirmed the U.S. District Court of Hawaii's decision. *See Flowers v. U.S. Army, 25th Infantry Div.,* 179 Fed. Appx. 986 (9th Cir.2006).

### C. Plaintiff's Lawsuits Against His Daughters, Letina Flowers and Tameca Flowers

During his service in the Army, plaintiff purchased United States Savings Bonds ("savings bonds") in the names of his daughters.[23] According to plaintiff, these savings bonds were stolen by Army personnel or others acting at the direction of the Army. Plaintiff's Motion for Discovery ("Pl.'s Mot.") 8; *see also* Plaintiff's Affidavit ("Pl.'s Aff.") ¶ 67. On December 17, 2001, plaintiff filed a lawsuit in state court against his daughters Letina Flowers and Tameca Flowers, seeking a judicial determination that he was the rightful owner of the savings bonds. *See* Defendant's Appendix ("Def.'s App.") 66 (discussing plaintiff's complaint filed in the Circuit Court of the First Circuit, State of Hawaii); *see also* Amended Complaint ("Am. Compl.") ¶¶ 114–18. However, plaintiff's state court complaint failed to disclose that the government, in full compliance with the applicable United States Department of Treasury ("Treasury Department") rules and regulations, made payments to Letina Flowers and Tameca Flowers for the loss of the savings bonds. Def.'s App. 66. When plaintiff's daughters failed to respond to the complaint, the state court entered a default judgment against them. *Id.* Then, as plaintiff requested, the state court ordered that the bonds be replaced in plaintiff's name. *Id.*

---

**21.** First Hawaiian filed a stipulation stating it violated the RFPA. *Flowers,* 295 F.Supp.2d at 1141. The U.S. District Court of Hawaii treated the stipulation as a judicial admission. *Id.*

**22.** The RFPA at 12 U.S.C. § 3417 provides:

(a) Liability of agencies or departments of United States or financial institutions
Any ... financial institution obtaining or disclosing financial records or information contained therein in violation of this chapter is liable to the customer to whom such records relate in an amount equal to the sum of—
(1) $100 without regard to the volume of records involved;

(2) any actual damages sustained by the customer as a result of the disclosure;
(3) such punitive damages as the court may allow, where the violation is found to have been willful or intentional; and
(4) in the case of any successful action to enforce liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.
When First Hawaiian filed the stipulation admitting a violation of the RFPA, First Hawaiian objected to judgment in excess of $200, representing $100 per plaintiff. *Flowers,* 295 F.Supp.2d at 1141.

**23.** *See infra* Part III.B.1.

(referring to a default judgment dated March 28, 2002).

On January 14, 2003, subsequent to the state court action, plaintiff filed suit in the U.S. District Court of Hawaii against the Secretary of the Treasury Department, the Naval Criminal Investigative Service ("NCIS"), the Army, and his daughters Letina Flowers and Tameca Flowers. *Id.* at 42–61. Plaintiff requested that the court order the United States government to reissue the savings bonds in his name [24] under the Little Tucker Act.[25] *Id.* The U.S. District Court of Hawaii dismissed plaintiff's complaint, ruling that the court lacked jurisdiction over plaintiff's claim relating to the savings bond valued in excess of $10,000 since jurisdiction lies exclusively with the Court of Federal Claims.[26] *Id.* at 67–68. The U.S. District Court of Hawaii dismissed plaintiff's remaining claims, finding that plaintiff lacked standing because he was not the registered owner of the savings bonds.[27] *Id.* at 69–72.

In affirming the U.S. District Court of Hawaii's ruling, the Ninth Circuit noted that the "only interest Flowers claims in the bonds is the ownership interest supposedly established by the state court judgment. But 'registration is conclusive of ownership.'" *Flowers v. Sec'y of the U.S. Dep't of Treasury*, 132 Fed.Appx. 728, 729 (9th Cir. 2005) (citing 31 C.F.R. § 353.5(a)). Further, the Ninth Circuit held that because plaintiff was not the registered owner, he "cannot, under the principles of federal supremacy, rely on a contrary state court judgment to establish ownership." 132 Fed.Appx. at 729.

### D. Procedural Background

Plaintiff filed his complaint in this court on October 31, 2005. In response, defendant filed a "Motion to Dismiss or, in the Alternative, for Judgment Upon the Administrative Record, in part, and for Summary Judgment, in part" on April 7, 2006. Plaintiff then filed "Objections To The United States Administrative Files Filed on March 07, 2006 And Supplement to Administrative Files Filed On March 22, 2006" ("Objections"). In his Objections, plaintiff requested that the court "allow discovery on the authenticity, admissibility, and accuracy of the records submitted." Objections 1. Plaintiff is a *pro se* litigant, and as such, the court holds his filings to a less stringent standard than pleadings filed by an attorney. *Hughes v. Rowe*, 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980). Accordingly, the court suspended briefing on defendant's dispositive motion to allow plaintiff the opportunity to file the appropriate motion for discovery in aid of summary judgment and supporting affidavit. Order, Apr. 7, 2006.

Plaintiff filed a motion to amend his complaint on April 20, 2006, which the court granted on June 16, 2006. Plaintiff then filed his amended complaint on June 27, 2006. In his amended complaint, plaintiff seeks relief for the following: (1) coercion into accepting NJP through the Army's obstruction of justice; (2) intimidation and violation of regulations including Article 15 of the UCMJ; (3) violation of Fifth Amendment due process and liberty interests; (4) violation of Fifth Amendment rights, flowing from the Army's alleged seizure of the savings bonds; (5) violation of a contractual agreement by the

---

**24.** The U.S. District Court of Hawaii noted that the only relief plaintiff sought was the reissuance of the savings bonds in his name. Def.'s App. 62.

**25.** The Little Tucker Act, 28 U.S.C. § 1346(a)(2) (2000), provides:
    The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of ... [a]ny ... civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. . . .

For claims exceeding $10,000, the Court of Federal Claims has exclusive jurisdiction, "unless Congress has withdrawn the Tucker Act grant of jurisdiction in the relevant statute." *Clinton v. Goldsmith*, 526 U.S. 529, 539, 119 S.Ct. 1538, 143 L.Ed.2d 720 (1999); *Eastern Enters. v. Apfel*, 524 U.S. 498, 520, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998).

**26.** *See supra* note 25.

**27.** *See infra* Part III.B. 1.a (discussing the Treasury Department regulations that govern registration and ownership of United States savings bonds).

Treasury Department regarding the savings bonds; and (6) breach of contract for damage to household goods.

In response to plaintiff's amended complaint, defendant again filed a "Motion to Dismiss or, in the Alternative, for Judgment Upon the Administrative Record, in part, and for Summary Judgment, in part" on August 4, 2006 ("Def.'s Disp. Mot."). In the motion, defendant seeks summary judgment on two counts of plaintiff's amended complaint: plaintiff's breach of contract allegations regarding the savings bonds, Count V, and plaintiff's breach of contract allegations that relate to the shipment of his household goods, Count VI. Def.'s Disp. Mot. 2.

In response to plaintiff's amended complaint and defendant's renewed dispositive motion, the court directed plaintiff to proceed with filing an RCFC 56(f) motion and supporting affidavit if plaintiff desired discovery. Order, Aug. 8, 2006. The court directed plaintiff to state his reasons for discovery and the type of discovery needed to oppose defendant's dispositive motion. *Id.* The court emphasized in its order that "the sole focus of discovery is to gather evidence to rebut the arguments raised" by defendant's dispositive motion. *Id.* Again, the court suspended briefing on defendant's dispositive motion until the court resolved plaintiff's request for discovery. *Id.* Plaintiff filed his motion for discovery and supporting affidavit on August 29, 2006. Defendant filed a response to plaintiff's motion for discovery on October 11, 2006 ("Def.'s Resp."), and plaintiff filed a reply on November 9, 2006 ("Pl.'s Reply").

## II.  LEGAL STANDARDS

### A.  *Pro Se* Plaintiff

The pleadings of a *pro se* plaintiff are held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v.* *Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). A court should be "receptive to *pro se* plaintiffs and assist them." *Demes v. United States,* 52 Fed.Cl. 365, 369 (2002). Courts have "strained [their] proper role in adversary proceedings to the limit, searching [the record] to see if plaintiff has a cause of action somewhere displayed." *Ruderer v. United States,* 188 Ct.Cl. 456, 412 F.2d 1285, 1292 (1969). Nevertheless, "[t]he fact that [a plaintiff] acted *pro se* in the drafting of his complaint may explain its ambiguities, but it does not excuse its failures, if such there be." *Henke v. United States,* 60 F.3d 795, 799 (Fed.Cir.1995). Although a *pro se* plaintiff is granted leniency in presenting his case, his *pro se* status does not provide him immunity from pleading facts upon which a valid claim can rest. *See, e.g., Constant v. United States,* 929 F.2d 654, 658 (Fed.Cir.1991) (sanctioning *pro se* plaintiff for filing frivolous appeal). As the United States Court of Federal Claims ("Court of Federal Claims") stated in *Demes,* "[w]hile a court should be receptive to *pro se* plaintiffs and assist them, justice is ill-served when a jurist crosses the line from a finder of fact to advocate." 52 Fed.Cl. at 369.

### B.  Summary Judgment[28]

Summary judgment is appropriate only when there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." RCFC 56(c). RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure ("FRCP") and is similar in language and effect.[29] Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c).

---

28.  In ruling on that portion of defendant's dispositive motion seeking summary judgment, this court applies RCFC 56, not the standards set forth in RCFC 52.1 that relate to judgment on the administrative record. In this opinion and order, this court relies on the administrative record to provide a factual background.

29.  In general, the rules of this court are patterned on the FRCP. Therefore, precedent under the FRCP is relevant to interpreting the rules of this court, including RCFC 56. *See Jay v. Sec'y of HHS,* 998 F.2d 979, 982 (Fed.Cir.1993); *Imperial Van Lines Int'l, Inc. v. United States,* 821 F.2d 634, 637 (Fed.Cir.1987); *Lichtefeld–Massaro, Inc. v. United States,* 17 Cl.Ct. 67, 70 (1989).

RCFC 56(c) states that the moving party bears the burden of demonstrating that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Creppel v. United States*, 41 F.3d 627, 630–31 (Fed.Cir.1994); *Meyers v. Asics Corp.*, 974 F.2d 1304, 1306 (Fed.Cir.1992). "[D]isputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id.*

When reaching a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Id.* at 249, 106 S.Ct. 2505. The judge is not required to make findings of fact, but instead, must determine whether there "are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "On summary judgment the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *see also Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985); *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine factual dispute exists by presenting evidence that establishes the existence of an element of its case. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

## C. Discovery Under RCFC 56

Once a party files a motion for summary judgment, the burden of production shifts to the nonmoving party, who must (1) rehabilitate the evidence offered by the moving party; (2) produce additional evidence showing the existence of a genuine issue of material fact under RCFC 56(e); or (3) under RCFC 56(f), provide an affidavit explaining why discovery is necessary. *See* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2727, pp. 471–72 (3d ed. 1998) ("*Federal Practice and Procedure*"); *see also* 10B *Federal Practice and Procedure* §§ 2738, 2740.

RCFC 56(e) states:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.... When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Further, RCFC 56(f) provides:

Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or

depositions to be taken or discovery to be had or may make such other order as is just.

■ A party who seeks discovery under RCFC 56(f) must state in an affidavit the "explicit reasons why discovery is required in opposition to the motion for summary judgment." *Opryland USA, Inc. v. Great Am. Music Show, Inc.*, 970 F.2d 847, 852 (Fed. Cir.1992). "Rule 56(f) serves the dual purpose of safeguarding against too hasty a grant of summary judgment, while requiring that parties who seek time for additional discovery have not been dilatory...." *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 809 (Fed.Cir.1999). The party moving for discovery must " 'state with some precision the materials he hope[s] to obtain with further discovery, and exactly how he expect[s] those materials would help him in opposing summary judgment.' " *Simmons Oil Corp. v. Tesoro Petroleum Corp.*, 86 F.3d 1138, 1144 (Fed.Cir.1996) (citation omitted); *see also First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 265, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1967) (noting that RCFC 56(f) "provides for comparatively limited discovery for the purpose of showing facts sufficient to withstand a summary judgment motion"). "In moving for relief under Rule 56(f), a party must demonstrate specifically 'how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact.' " *Simmons Oil*, 86 F.3d at 1144 (citation omitted).

The United States Court of Appeals for the Federal Circuit ("Federal Circuit") has not established criteria to consider in evaluating a motion for discovery under RCFC 56(f). *Cf. Theisen Vending Co. v. United States*, 58 Fed.Cl. 194, 198 (2003) (outlining a five-part test for relief under RCFC 56(f) grounded in precedent from other circuit courts). However, citing the United States Court of Appeals for the First Circuit's explanation of Rule 56(f)'s burden, the Federal Circuit has explained:

'In short, the facts that the movant seeks to discover must be foreseeably capable of breathing life into his claim or defense. Evaluating the potential significance of un-known facts in regard to unadjudicated issues is something of a metaphysical exercise. Consequently, the threshold of materiality at this stage of a case is necessarily low.'

*Vivid Techs.*, 200 F.3d at 809 (citing *Resolution Trust v. N. Bridge Assocs., Inc.*, 22 F.3d 1198, 1207 (1st Cir.1994)).

RCFC 56(f) motions "are generally favored, and should be liberally granted." *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 534 (5th Cir.1999). However, the "parties cannot evade summary judgment simply by arguing that additional discovery is needed; rather they must meet the requirements of Rule 56(f)." *Brown v. Miss. Valley State Univ.*, 311 F.3d 328, 333 n. 5 (5th Cir.2002); *see also Price ex rel. Price v. W. Res., Inc.*, 232 F.3d 779, 783 (10th Cir. 2000) ("Rule 56(f) does not operate automatically. Its protections must be invoked and can be applied only if a party satisfies certain requirements."). As the Federal Circuit stated, "[s]ummary judgment need not be denied merely to satisfy a litigant's speculative hope of finding some evidence [through discovery] that might tend to support a complaint." *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1566 (Fed.Cir. 1987) (second alteration in original).

## III. DISCUSSION

### A. Discovery May Be Appropriate When a Motion for Summary Judgment Is Pending

Discovery may be appropriate when a motion for summary judgment is pending if the nonmoving party is able to establish that discovery is "needed to place at issue material factual questions in opposition to the motion [for summary judgment]." *Opryland*, 970 F.2d at 852. RCFC 56(f) provides the nonmovant with protection from being " 'railroaded' by a premature motion for summary judgment." *Id.* As stated above, "RCFC 56(f) enables a court to deny or stay a motion for summary judgment to permit additional discovery if the non-movant explains by affidavit why it cannot fulfill the requirements of RCFC 56(e), under which it must 'set forth facts showing that there is a genuine issue

for trial.'" *Theisen,* 58 Fed.Cl. at 197 (citing RCFC 56(e)).

Defendant argues that because jurisdictional facts are at issue, discovery is not appropriate here. Def.'s Resp. 1, 10. Additionally, defendant asserts because plaintiff has supplemented the record, plaintiff's claim that discovery is needed to correct the administrative record is moot. *Id.* at 3. Furthermore, defendant contends that discovery is inappropriate because a motion to dismiss is pending. *Id.*

The court disagrees with defendant's assertion that discovery is automatically inapposite because plaintiff has supplemented the administrative record and a dispositive motion is pending. The United States Supreme Court ("Supreme Court") has stated clearly that summary judgment is inappropriate unless the parties are allowed adequate time for discovery. *See Celotex,* 477 U.S. at 326, 106 S.Ct. 2548. The Supreme Court noted in *Celotex* that "[a]ny potential problem with premature motions can be adequately dealt with under Rule 56(f), which allows a summary judgment motion to be denied ... if the nonmoving party has not had an opportunity to make full discovery." *Id.*

The question in this case now becomes whether plaintiff's motion and accompanying affidavit are sufficient to stay summary judgment on Counts V and VI of plaintiff's amended complaint. For the reasons set forth below, the court finds that plaintiff's submission fails to satisfy the requirements of RCFC 56(f); therefore, defendant is entitled to summary judgment on Counts V and VI.

**B. Plaintiff Fails to Meet His Burden Under RCFC 56(f)**

To obtain discovery under RCFC 56(f), plaintiff's motion and affidavit must seek information to meet defendant's jurisdictional challenge, rather than request information that relates to the merits of plaintiff's claims. *See Simmons Oil,* 86 F.3d at 1144 (upholding a lower court's decision that denied Simmons' Rule 56(f) motion and affidavit because the motion focused on the merits of Simmons' own claim rather than the statute of limitations issue raised in defendant's dispositive motion). In his motion for discovery, plaintiff outlines the discovery he seeks regarding three claims: military pay, United States savings bonds, and the shipment of household goods. *See generally* Pl.'s Mot.; Pl.'s Aff. Plaintiff suggests that the discovery requested is "necessary for a factual and supplemental [sic] administrative record essential to plaintiff's response." Pl.'s Mot. 1.

Defendant's dispositive motion, however, seeks summary judgment solely on two counts of plaintiff's amended complaint: (1) breach of contract regarding the savings bonds (Count V) and (2) breach of contract for failure to pay for damages related to the shipment of his household goods (Count VI). *See* Def.'s Disp. Mot. 2. Regarding Counts I–III of plaintiff's amended complaint, which concern plaintiff's military pay allegations, defendant requests dismissal for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1); or in the alternative, for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(6); or in the alternative, judgment upon the administrative record, pursuant to RCFC 52.1.[30] *Id.* at 1. Defendant does not seek summary judgment regarding plaintiff's military pay

---

**30.** Defendant's dispositive motion seeks judgment on the administrative record pursuant to RCFC 56.1. Def.'s Disp. Mot. 1. However, RCFC 56.1 was repealed, and RCFC 52.1 replaced RCFC 56.1 on June 20, 2006. *See* 2006 Adoption, Rules Committee Note, RCFC 52.1 (June 20, 2006). This court issued an order on September 5, 2006, stating that the court was adopting the amendments to the RCFC, and RCFC 52.1 would apply in the case *sub judice.* The court further noted that adoption of RCFC 52.1 did not substantively alter this proceeding, and RCFC 52.1(b)'s requirements, in essence, are similar to the requirements of RCFC 56.1(b).

According to the Rules Committee, RCFC 56.1 "applied certain standards borrowed from the procedure for summary judgment to review of an agency decision on the basis of an administrative record. That incorporation proved to be confusing in practice because only a portion of the summary judgment standards were borrowed." As the Rules Committee Note reflects, summary judgment standards are not pertinent to judicial review upon an administrative record. *See* 2006 Adoption, Rules Committee Note, RCFC 52.1; *see also Bannum, Inc. v. United States,* 404 F.3d 1346, 1355–57 (Fed.Cir.2005).

claims. Additionally, defendant asks the court to dismiss the takings allegations, Count IV, for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1); or, in the alternative, to dismiss the allegations for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(6). *Id.*

As stated in *Chevron,* "[d]iscovery is not required for the Court to render a decision on a motion to dismiss based on lack of subject matter jurisdiction or based on failure to state a claim upon which relief can be granted." *Chevron U.S.A., Inc. v. United States,* 72 Fed.Cl. 817, 819 (2006). Because defendant seeks summary judgment exclusively on plaintiff's breach of contract allegations regarding the savings bonds and shipment of household goods, the court addresses below only these claims to determine whether plaintiff is entitled to discovery under RCFC 56.

### 1. Plaintiff's Savings Bond Allegations

Plaintiff alleges that Major Ohlweiler on August 31, 2000, "through information and personal knowledge was instrumental in removing [plaintiff's] suitcase from the North Island Naval Station" which allegedly contained United States savings bonds. Pl.'s Mot. 8; *see also* Pl.'s Aff. ¶ 67. As a result, plaintiff seeks to depose Major Ohlweiler.

Pl.'s Mot. 9; *see also* Pl.'s Aff. ¶ 69. Further, plaintiff seeks to depose "assigned agents from the Bureau of Public Debt," including Ms. Judith A. Hawes,[31] and possibly two of plaintiff's children: Letina Flowers and Tameca Flowers. Pl.'s Mot. 12. Plaintiff states that his daughters "categorically" deny receiving "any funds from the Treasury [Department] for bonds." [32] *Id.* at 11; *see also* Pl.'s Aff. ¶¶ 72–73, 77. Plaintiff further claims that "it will be necessary to acquire the passenger manifests of both flights from Hickam [Air Force Base], Hawaii to North Island, San Diego and Charleston, South Carolina, and the telephone log of [United States Automobile Association]'s Tracy Hunter." Pl.'s Mot. 14. In addition, plaintiff seeks to depose personnel at North Island Naval Station including Agent Brian Moran from the NCIS to determine why his supervisor apparently instructed him not to conduct an investigation into the alleged theft of plaintiff's personal property. *Id.; see also* Pl.'s Aff. ¶ 70. Plaintiff asserts that such discovery will establish Major Ohlweiler's "knowledge and involvement with the removal of the suitcase." Pl.'s Mot. 9.

To support his request for discovery, plaintiff argues that "[i]f this Court allows the

---

**31.** On April 7, 2006, defendant submitted a dispositive motion pursuant to plaintiff's original complaint. One exhibit accompanying defendant's motion was a declaration by Judith A. Hawes, Senior Technical Advisor in the Office of Investor Services, Accrual Services Division, Bureau of the Public Debt, Department of the Treasury. *See* Exhibit A, Defendant's Motion to Dismiss, or in the Alternative, for Judgment Upon the Administrative Record, in part, and for Summary Judgment, in Part, filed Apr. 7, 2006. Thereafter, plaintiff filed an amended complaint, and defendant filed another dispositive motion to address the claims in plaintiff's amended complaint. *See* Def.'s Disp. Mot., filed Aug. 4, 2006. Accompanying defendant's August 4, 2006 dispositive motion, was a declaration by Mary E. Hardman, Def.'s App. 1–2D, who assumed the duties of Ms. Hawes upon Ms. Hawes's retirement from government service on March 31, 2006. *See* Defendant's Motion for Leave to File Replacement Declaration, filed Apr. 14, 2006.

**32.** In his affidavit, plaintiff avers that his daughters informed him that they did not report the savings bonds lost, Pl.'s Aff. ¶ 72, they did not have "the amount or serial numbers of the bonds," *id.,* and they did not redeem the bonds. *Id.* ¶¶ 73, 77. However, plaintiff then states that the information regarding the bonds, including the "serial numbers and amount of savings bonds," was provided to his daughters. *Id.* ¶ 74. Plaintiff states that "[e]ither perjury has been committed or the government has continued its fabrication of the truth" because questions on the Claim for Lost, Stolen or Destroyed United States Savings Bonds, Form PD F 1048 E, ("Claim Form for U.S. Savings Bonds") "could not have been answered by [his] daughters." *Id.* ¶¶ 79, 86. Plaintiff seems to imply, first, that his daughters had no involvement with completing the Claim Form for U.S. Savings Bonds and redeeming the bonds, but then contradicts himself, stating that the government provided information regarding the bonds to his daughters. Pl.'s Reply 17 (stating that "no action [was] filed by either Tameca or Le[t]ina until clothed [sic] with information provided by the Bureau."). Further, plaintiff's statement that his daughters informed him that they did not receive payment is inadmissible hearsay, and plaintiff has not provided any affidavits by his daughters to supplement the record. In any event, plaintiff is not the owner of the savings bonds, and thus lacks standing to assert a claim for the savings bonds.

government to proceed with exhibits and incorrect and incomplete administrative record and restrict discovery, the adversary [sic] process is discredited and there exist [sic] the government 'self serving' information provided for the court to make a just determination." *Id.* at 13. Plaintiff states that he "intends to show that U.S. Saving Bonds were purchased by him [and] maintained in his possession until removed by a government person under knowledge and supervision of Maj. Ohlweiler." *Id.* at 14. Plaintiff further states that the "Circuit Court of the First Circuit, State of Hawaii proclaim[ed] Plaintiff as owner of the bonds," and Major Ohlweiler allegedly "orchestrated" the "taking of the U.S. Savings Bonds" to "thwart [plaintiff's] claim in any federal court." *Id.* at 12. Plaintiff claims that the savings bonds he purchased were a contract "between the purchaser and the U.S. Treasury," *id.*, and the Treasury Department "violated its own rules and without authorization used and provided information to [his] daughters" to submit a claim for the savings bonds. Pl.'s Aff. ¶ 86.

### a. Plaintiff Is Not the Registered Owner of the Savings Bonds

Plaintiff asks this court to order the Treasury Department to reissue the savings bonds in his name pursuant to a state court judgment and Treasury Department regulations. *See* Am. Compl. Wherefore ¶¶ 11–14.[33] Defendant argues that United States savings bonds are governed by regulations that generally state the registered owner of a bond is presumed to be the owner. Def.'s Disp. Mot. 18. Further, defendant states that because the savings bonds are governed by federal law, plaintiff's state court judgment is inapplicable. *Id.* at 19.

Article I, Section 8, Clause 2 of the United States Constitution delegates to the Congress the power "(t)o borrow Money on the credit of the United States." Pursuant to this power, Congress authorized the Secretary of the Treasury Department, with the approval of the President, to issue savings bonds. *See* 31 U.S.C. § 757c(a), revised as 31 U.S.C. § 3105(a). United States savings bonds are governed by regulations promulgated under 5 U.S.C. § 301 and 31 U.S.C. §§ 321, 3105, and 3125. These regulations are codified at 31 C.F.R. Part 353 (2006).

Generally, savings bonds are "not transferable and are payable only to the owners named on the bonds." 31 C.F.R. § 353.15. Further, "registration is conclusive of ownership." *Id.* § 353.5(a). A savings bond may "be registered in the names of individuals" and "payable on death to another." *Id.* § 353.7(a)(3). This type of savings bond is considered to be registered in "beneficiary form." *Id.* § 353.7(a) (providing that a savings bond may be registered either in single ownership form, coownership form, or beneficiary form). Pursuant to the regulations, when payment is made during the lifetime of the owner of a "beneficiary bond," "the beneficiary will cease to have any interest in the bond." *Id.* § 353.38. If savings bonds are lost, stolen, destroyed, and the "serial numbers of the ... bonds are known," the claimant should execute an application for relief on the appropriate form and submit it to the Bureau of Public Debt, Parkersburg, WV 26101."[34] *Id.* § 353.26(a). If a savings bond is lost, stolen, or destroyed, the application for relief must be made by "the person authorized under these regulations to request payment of the bond." *Id.* § 353.26(d). Relief is granted "either by the issuance of a bond bearing the same issue date as the bond for which the claim was filed or by the issuance of a check in payment." *Id.* § 353.26(e).

Letina Flowers was the registered owner of ten savings bonds with denominations

---

**33.** The allegations of plaintiff's amended complaint are set forth in paragraph form, numbered 1 to 135. The amended complaint also contains a "Wherefore" section that begins anew with paragraph 1 to paragraph 19. This latter section shall be referred to as "Wherefore ¶ ."

**34.** If the serial number of a bond is unknown, "the claimant must provide sufficient information to enable the Bureau of Public Debt to identify the bond by serial number." 31 C.F.R. § 353.26(b). The Bureau of Public Debt will then provide the appropriate application form and instructions. *Id.* However, if a claim is filed "six years or more after the final maturity of a savings bond," the claim will not be entertained "unless the claimant supplies the serial number of the bond." *Id.* § 353.29(c).

ranging from $100 to $5,000, issued in 1986 and 1987, that were payable on death to plaintiff Marshall K. Flowers. Def.'s App. 2, 3–12, 17. Tameca Flowers was the registered owner of two savings bonds with denominations of $5,000 and $10,000, issued in 1986 and 1987, respectively, that were payable on death to plaintiff Marshall K. Flowers. *Id.* at 2A, 13–14, 17. Because the savings bonds were registered in the names of plaintiff's daughters Letina Flowers and Tameca Flowers, pursuant to 31 C.F.R. § 353.5(a),[35] they were presumed to be the owners. When plaintiff filed the Claim Form for U.S. Savings Bonds alleging the savings bonds had been stolen, Def.'s App. 37–39, and requesting the savings bonds be reissued in plaintiff's name, *id.* at 16–19, the Treasury Department notified plaintiff that the registered owners, his daughters, were required to file the claims. *Id.* at 24. According to Treasury Department regulations, savings bonds are only reissued to the registered owner, 31 C.F.R. § 353.51, and by his own admission, plaintiff was not the registered

owner.[36] Def.'s App. 16. Although minors when plaintiff purchased the bonds in his daughters' names,[37] Letina Flowers and Tameca Flowers had surpassed the age of majority when they filed their respective Claim Forms for U.S. Savings Bonds.[38] Subsequent to the filing of each claim, the Treasury Department approved the forms and issued checks, rather than replacement bonds as requested.[39] *Id.* at 24, 27–31, 34–36. Further, the checks issued by the Treasury Department were endorsed and bear the signatures of Letina Flowers and Tameca Flowers. *Id.* at 40–41.

While plaintiff admits that his daughters were the owners of the savings bonds, plaintiff claims that a state court judgment he obtained against his children confers him with ownership of the savings bonds. Pl.'s Mot. 10. To support his claim, plaintiff relies upon 31 C.F.R. § 353.20[40] for the proposition that the Treasury Department will recognize a claim against the owner of a savings bond and conflicting claims of ownership between

**35.** This section provides:

Registration is conclusive of ownership. Savings bonds are issued only in registered form. The registration must express the actual ownership of, and interest in, the bond. The registration is conclusive of ownership, except as provided in Sec. 353.49.

31 C.F.R. § 353.5(a). Section 353.49 provides that "[a] bond may be reissued to correct an error in registration upon appropriate request supported by satisfactory proof of the error." *Id.* § 353.49. This exception to 31 C.F.R. § 353.5(a) is inapplicable here because plaintiff does not claim any errors with registration.

**36.** Plaintiff admits that his daughters were the registered owners of the savings bonds. Am. Compl. ¶¶ 95, 97–99; Pl.'s Reply 18; Def.'s App. 16 (Letter from plaintiff to the Treasury Department on December 7, 1999, stating that his "daughters are listed as owner[s]" of the savings bonds). However, plaintiff erroneously believes that because he purchased the savings bonds and "maintained [them] in his possession until removed by a government person under knowledge and supervision of Maj. Ohlweiler," that possessing the bonds or purchasing the bonds confers any right of ownership. Pl.'s Mot. 14; *see also* Pl.'s Reply 15.

**37.** Treasury Department regulation 31 C.F.R. § 353.6(c)(3) allows savings bonds to be purchased with the funds of another and to be registered to name the minor as owner. Further, 31 C.F.R. § 353.62 states that even a minor may receive payment for a bond if the registration

does not indicate that there is a representative of the minor's estate, provided the minor is of "sufficient competency to sign the request for payment and to understand the nature of the transaction."

**38.** Plaintiff's complaint filed in the U.S. District Court of Hawaii on January 14, 2003, states that "Letina Michelle Flowers is 26 year[s] old" and "Tameca Armanda Flowers is the 24 years [sic] old daughter of Plaintiff." Def.'s App. 48. If Letina Flowers and Tameca Flowers were 26 years old and 24 years old, respectively, in 2003, then they were over the age of majority, 18 years old, when they filed their claims for the savings bonds in 2001. *Id.* at 26–36. Plaintiff also states that "[d]uring the period of August 31, 2000," both his daughters were adults. Pl.'s Aff. ¶ 72.

**39.** The claims submitted by Letina Flowers and Tameca Flowers reflect that each daughter supplied the serial numbers for the bonds they claimed had been lost. Def.'s App. 27–31, 34–36.

**40.** Treasury Department regulation 31 C.F.R. § 353.20 provides in relevant part:

(b) The Department of Treasury will recognize a claim against an owner of a savings bond and conflicting claims of ownership of, or interest in, a bond between coowners or between the registered owner and the beneficiary, if established by valid judicial proceedings, but only as specifically provided in this subpart.

the registered owner and the beneficiary if established by a valid judicial proceeding. Pl.'s Reply 15–16. Plaintiff contends that the default judgment obtained in a state court in Hawaii "determined that Plaintiff purchased [the] bonds with personal funds and that Plaintiff is the true owner." Pl.'s Mot. 10; *see also* Def.'s App. 66 (Order Dismissing Case, *Flowers v. Sec'y of the Treasury*, Civil No. 03–00016 SOM/LEK (D.Haw.2003) (referring to the state court default judgment)).

■ Plaintiff's reliance upon the default judgment obtained in state court is misplaced. First, the state court entered a default judgment because plaintiff's daughters failed to respond to the lawsuit filed against them by their father. In an entry of default judgment, the underlying issues are not actually litigated.[41] *See Lee v. United States*, 124 F.3d 1291, 1296 (Fed.Cir.1997); *Meyer v. Rigdon*, 36 F.3d 1375, 1379 (7th Cir.1994). Second, state courts do not have jurisdiction to determine the federal government's obligations with respect to savings bonds. *See Bank of Am. Nat. Trust & Sav. Ass'n v. Parnell*, 352 U.S. 29, 34, 77 S.Ct. 119, 1 L.Ed.2d 93 (1956) ("Federal law of course governs the interpretation of the nature of the rights and obligations created by the Government bonds themselves."). Indeed, in *Rotman v. United States*, 31 Fed.Cl. 724, 725 (1994), the court found that the Treasury Department's regulations governed the transfer and redemption of savings bonds. Thus, federal regulations are the source of authority to determine ownership and preempt state court rulings to the contrary. *See Free v. Bland*, 369 U.S. 663, 668, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962). As the Treasury Department's regulation clearly states, "registration is conclusive of ownership." 31 C.F.R. § 353.5(a). Consequently, plaintiff's

reliance upon the state court default judgment is unavailing.

Further, a savings bond is a contract between the registered owner of the savings bond and the United States. *Estate of Curry v. United States*, 22 Ohio Misc. 245, 409 F.2d 671, 673 (6th Cir.1969). If a plaintiff is not the registered owner, then the plaintiff is not in privity of contract with the government and lacks standing to recover on the savings bonds. *Rotman*, 31 Fed.Cl. at 725 (finding that the plaintiff lacked privity of contract with the United States because the bonds were not registered in her name, therefore plaintiff lacked standing to sue). In the instant case, plaintiff admits he was not the registered owner of the savings bonds. Thus, plaintiff is not in privity with the government and lacks standing to maintain an action for money damages for the alleged loss of the savings bonds.

**b. Plaintiff Has Not Demonstrated His Entitlement to Discovery on any Issue Related to His Savings Bond Claims**

■ As explained above, in order for this court to allow plaintiff discovery regarding his savings bond allegations, plaintiff must establish that a genuine issue of material fact exists. The court also must determine whether plaintiff's motion for discovery meets the requirements of RCFC 56(f). Although plaintiff articulates specific areas of discovery, plaintiff's motion and affidavit fail to satisfy the remaining requirements of the rule. For example, even if this court allowed plaintiff the discovery he seeks regarding the savings bonds that were allegedly stolen from his possession,[42] no information obtained through discovery would raise a dispute over material facts necessary to rebut defendant's assertion that plaintiff lacks

---

**41.** This court is not critiquing the entry of default judgment by the state court judge. The state court judge did not run afoul of federal law concerning the determination of the ownership of the savings bonds by granting the entry of default judgment. The entry of such judgments is merely procedural.

**42.** To the extent that plaintiff's complaint is construed as alleging that members of the Army engaged in criminal or tortious conduct by seizing bonds from plaintiff's possession, those allegations are beyond this court's jurisdiction. The

Tucker Act, 28 U.S.C. § 1491(a)(1) (2000), provides:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

standing. Plaintiff admits the savings bonds were registered in the names of his daughters, Letina Flowers and Tameca Flowers. *See* Am. Compl. ¶¶ 95, 97–99; Pl.'s Reply 18; Def.'s App. 16. Thus, plaintiff's motion and affidavit fail to satisfy the requirements of RCFC 56(f), and defendant is entitled to summary judgment on plaintiff's breach of contract claim regarding the U.S. savings bonds, Count V of plaintiff's amended complaint.

**c. Plaintiff Is Collaterally Estopped From Litigating the Savings Bond Claims That Were Litigated Before the U.S. District Court of Hawaii Except for the Claim Regarding the Savings Bond Valued in Excess of $10,000**

As explained above, plaintiff filed suit in the U.S. District Court of Hawaii on January 14, 2003, asking the court to order the United States government to reissue the savings bonds in his name under the Little Tucker Act.[43] Def.'s App. 42–61. The U.S. District Court of Hawaii dismissed plaintiff's complaint, ruling that the court lacked jurisdiction over plaintiff's claim relating to the savings bond valued in excess of $10,000 since jurisdiction lies exclusively with the Court of Federal Claims.[44] *Id.* at 67–68. The U.S. District Court of Hawaii dismissed plaintiff's remaining claims, finding that plaintiff lacked standing because he was not the registered owner of the savings bonds. *Id.* at 69–72. The Ninth Circuit affirmed the trial court's ruling. *Flowers,* 132 Fed.Appx. at 729.

■ In his complaint in this court, plaintiff again asserts ownership of the savings bonds at issue in the district court litigation. However, the doctrine of collateral estoppel prevents plaintiff from relitigating these claims. Collateral estoppel, also referred to as issue preclusion, focuses on whether a particular issue, rather than a claim or cause of action, already has been litigated. *Int'l Order of Job's Daughters v. Lindeburg & Co.,* 727 F.2d 1087, 1091 (Fed.Cir.1984). The Federal Circuit described issue preclusion as:

(1) the issue is identical to one decided in the first action; (2) the issue was actually litigated in the first action; (3) resolution of the issue was essential to a final judgment in the first action; and (4) plaintiff had a full and fair opportunity to litigate the issue in the first action.

*A.B. Dick Co. v. Burroughs Corp.,* 713 F.2d 700, 702 (Fed.Cir.1983).

■ Here, all four prongs are satisfied. First, the U.S. District Court of Hawaii addressed and the Ninth Circuit confirmed the very issue plaintiff raises in his amended complaint; namely, whether plaintiff was the owner of the savings bonds. Def.'s App. 69–72. Second, there can be no doubt that the issue was actually litigated because the U.S. District Court of Hawaii ruling that plaintiff's daughters were the registered owners of the savings bonds was affirmed by the Ninth Circuit. *Id.* Third, resolving the bond ownership issue was essential to the U.S. District Court of Hawaii's judgment. Lastly, plaintiff had a full and fair opportunity to litigate this issue in his suit before the district court. Consequently, plaintiff is collaterally estopped from litigating the same issue in this court regarding the savings bonds, except the savings bond valued in excess of $10,000. *See Lawlor v. Nat'l Screen Serv. Corp.,* 349 U.S. 322, 326, 75 S.Ct. 865, 99 L.Ed. 1122 (1955). As to the savings bond valued in excess of $10,000, this court has determined above that because plaintiff is not the registered owner of the savings bonds, he lacks standing to pursue a claim.

**2. Plaintiff's Allegations Regarding the Shipment of His Household Goods**

In Count VI of his amended complaint, plaintiff seeks damages due to the "Army['s] breach of contract and negligence." Am. Compl. Wherefore ¶ 15. He alleges that household "items were damaged [or] missing" when delivered by the Army from Hawaii to Australia. Am. Compl. ¶¶ 126–35. The Army allegedly delivered "sensitive"

---

43. *See supra* Part I.C (discussing plaintiff's complaint and the U.S. District Court of Hawaii's ruling).

44. *See supra* note 25.

household items to plaintiff's wife Anna Flowers without a power of attorney.[45] Pl.'s Mot. 15. Additionally, the Army allegedly "neglected to provide proper instruction for inspecting [sic] and documents required to claims loss [sic] and damaged property against the Army." *Id.* Plaintiff seeks discovery regarding his breach of contract claim related to these household goods. *Id.* He states that discovery "is essential" to determine if "Maj[.] John Ohlweiler ... influence[d] or instruct[ed] ... contractors in Australia to unpack items from crates and repack prior to delivery." *Id.* at 16. Further, plaintiff alleges that "Maj. Ohlweiler ... utilized [his] position ... to continue frivolous investigations necessary to obstruct proceeding [sic] in the U.S. District Court." *Id.* Plaintiff claims that the value of the damaged or lost property exceeds $50,000. Am. Compl. ¶¶ 133, 135.

Plaintiff states he submitted two separate claims—one to the 25th Infantry Division Claims Office and another to Schofield Barracks in Hawaii—but plaintiff claims the government has not "responded to the claim for sensitive items." Pl.'s Mot. 15–16. Defendant states that plaintiff received $4,425 for the claim submitted to the Army regarding damaged or lost property. Def.'s Disp. Mot. 28. Thus, defendant asserts that plaintiff's claim regarding his household goods has been litigated already, and the ruling on the claim cannot be reviewed. *Id.* at 31. In addition, if plaintiff's claim can be construed as sounding in tort, it is beyond this court's jurisdiction.[46]

### a. Claims by Members of the Armed Forces Against the Government for Damaged or Lost Personal Property

The Military Claims Act ("MCA"), 10 U.S.C. §§ 2731–2739 (2000), and the Military Personnel and Civilian Employees' Claims Act of 1964 ("MPCECA"), 31 U.S.C. §§ 240–243, recodified at 31 U.S.C. §§ 3721–3733 (2004), address claims by military personnel against the government. The MCA[47] provides:

Under such regulations as the Secretary concerned may prescribe, he, or, subject to appeal to him, the Judge Advocate General of an armed force under his jurisdiction, or the chief legal officer of the Coast Guard, as appropriate, if designated by him, may settle,[48] and pay in an amount not more than $100,000, a claim against the United States for—

(1) damage to or loss of real property including damage or loss incident to use and occupancy.

(2) damage to or loss of personal property bailed to the United States and including registered or insured mail damaged, lost, or destroyed by a criminal act while in the possession of the Army, Navy, Air Force, Marine Corps, or Coast Guard, as the case may be; or

(3) personal injury or death;

either caused by a civilian officer or employee of that department, or the Coast Guard, or a member of the Army, Navy, Air Force, Marine Corps, or Coast Guard, as the case may be, acting within the scope of his employment, or otherwise incident to

---

45. Plaintiff fails to describe with specificity the sensitivity of the household items and fails to cite authority that the items could not be delivered to his wife without a power of attorney. Further, the shipment form plaintiff completed and signed to ship his household items indicated that a member "or SPOUSE" was designated to receive the shipped items. Def.'s App. 87.

46. *See supra* note 42.

47. The MCA regulations are codified at 32 C.F.R. §§ 536.20–536.35 (2006). The regulations state: General. Claims based upon a single act or incident cognizable under Sec. Sec. 536.20 through 536.35, which are also cognizable under the [Federal Tort Claims Act] (28 U.S.C.

2671–2680) Sec. 536.50, the Army Maritime Claims Settlement Act (10 U.S.C. 4801–04, 4806) Sec. 536.60, the FCA (10 U.S.C. 2734), or title 31, U.S.C. section 3721 (Personnel Claims), will be considered first under the latter statutes. If not payable under any of those latter statutes, the claim will be considered under Sec. Sec. 536.20 through 536.35. 32 C.F.R. § 536.25(a).

48. Section 2731 of the MCA provides that " 'settle' means consider, ascertain, adjust, determine and dispose of a claim, whether by full or partial allowance or by disallowance." 10 U.S.C. § 2731.

noncombat activities of that department, or the Coast Guard.

10 U.S.C. § 2733(a) (footnote added).

■ Section 2735 of the MCA has a finality provision, which states that "[n]otwithstanding any other provision of law, the settlement of a claim under Section 2733, 2734, 2734(a), 2734(b), or 2737 of this title is final and conclusive." *Id.* § 2735. The binding precedent of the Federal Circuit provides that 10 U.S.C. § 2735 precludes judicial review of the military's disallowance of a claim under the MCA, absent a constitutional claim. In *Collins v. United States,* the Federal Circuit stated that "[w]e are convinced that when Congress included the finality provision in the Military Claims Act it intended that army claims would be considered and disposed of by the army and not by the courts." 67 F.3d 284, 287 (Fed.Cir.1995). Other circuit courts have followed the same reasoning. *Schneider v. United States,* 27 F.3d 1327, 1332 (8th Cir.1994); *Hata v. United States,* 23 F.3d 230, 232–33 (9th Cir.1994); *Rodrigue v. United States,* 968 F.2d 1430, 1432–34 (1st Cir.1992); *Poindexter v. United States,* 777 F.2d 231, 233–37 (5th Cir.1985).

■ The MPCECA also governs claims brought against the government by a servicemember. Section 3721 of the MPCECA provides:

> (b)(1) The head of an agency may settle and pay not more than $40,000 for a claim against the Government made by a member of the uniformed services under the jurisdiction of the agency or by an officer or employee of the agency for damage to, or loss of, personal property incident to service.... A claim allowed under this subsection may be paid in money or the personal property replaced in kind.

31 U.S.C. § 3721(b)(1). The MPCECA also provides that claims settled under the Act are "final and conclusive." *Id.* § 3721(k). In *Shull v. United States,* the Court of Claims [49]

held that the Army's denial of a plaintiff's claim under the MPCECA was beyond judicial review. 228 Ct.Cl. 750, 758, 1981 WL 21476 (1981). Thus, the Federal Circuit and its predecessor have read the MCA and the MPCECA to contain the same language regarding the finality of settling military claims. *See Collins,* 67 F.3d at 287 (noting that the MCA and the MPCECA have "the same identical words" regarding settling military claims and have "exactly the same words regarding finality of settlement"); *Shull,* 228 Ct.Cl. at 757 (noting that "other federal courts have reached the same conclusion as to the related and identical finality language of [the MCA at] 10 U.S.C. § 2735 (1976), which is applicable to military claims brought under 10 U.S.C. §§ 2731–2737"); *see also Merrifield v. United States,* 14 Cl.Ct. 180, 184–85 (1988).

■ Generally, a presumption exists that Congress intends for judicial review of an administrative action. *See Block v. Cmty. Nutrition Inst.,* 467 U.S. 340, 349, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984); *Collins v. United States,* 32 Fed.Cl. 256, 258 (1994) (noting that "[o]rdinarily there is a strong presumption that Congress intends for judicial review of final agency action"), *aff'd,* 67 F.3d 284 (Fed.Cir.1995). However, such a presumption "may be overcome by specific language or specific legislative history that is a reliable indicator of congressional intent." *See Block,* 467 U.S. at 349, 104 S.Ct. 2450. The Supreme Court in *Lindahl v. Office of Personnel Management* held that when a statute specifically withholds judicial review, then judicial review is excluded. 470 U.S. 768, 778–79, 105 S.Ct. 1620, 84 L.Ed.2d 674 (1985). Consequently, this court is bound by long-established precedent that both the MCA and the MPCECA preclude judicial review.

### b. This Court Lacks Jurisdiction Over Plaintiff's Claim for Damages to His Household Goods

■ In August 1999, plaintiff filed an application with the Army for shipment of per-

---

49. The Federal Courts Improvement Act of 1982 ("FCIA"), Pub.L. No. 97–164, 96 Stat. 25 (codified as amended in sections throughout 28 U.S.C.) extracted the appellate function of the Court of Claims and conferred it on the newly established the Federal Circuit. The FCIA also created the United States Claims Court to contin-

ue the trial function of the Court of Claims. *See* FCIA §§ 105; 28 U.S.C. §§ 171–177. The name United States Claims Court was changed to United States Court of Federal Claims on October 29, 1992, with the enactment of the Federal Courts Administrative Act of 1992, Pub.L. No. 102–572, § 902, 106 Stat. 4506, 4516.

sonal property from Honolulu, Hawaii to Adelaide, Australia with delivery in October 1999. Def.'s App. 87. The shipment form plaintiff completed indicated that a member "or SPOUSE" was designated to receive the shipped items. *Id.* On a Joint Statement of Loss or Damage at Delivery, DD Form 1840, completed on May 30, 2000, plaintiff's spouse Anna Flowers acknowledged receipt of household items and reported damaged items. *Id.* at 88. On July 20, 2000, plaintiff completed another DD Form 1840, acknowledging receipt of household items and reporting damaged items. *Id.* at 89. On December 6, 2001, plaintiff completed DD Form 1842, Loss of or Damage to Personal Property Incident to Service, and claimed $8,316.70. *Id.* at 90–91. The Army approved $4,425 for plaintiff's losses. *Id.* at 90–95 (copy of the approved Claim for Loss or Damage to Personal Property Incident to Service, DD Form 1842, that plaintiff submitted and copies of payments to plaintiff).

For plaintiff's claim to fall within this court's jurisdictional ambit, plaintiff must demonstrate that (1) the government has waived sovereign immunity and (2) a substantive right for the remedy requested exists. As such, the Tucker Act only confers jurisdiction upon this court when a substantive right exists. *See United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). For this court to exercise jurisdiction over plaintiff's claim regarding loss and damage to his household goods, there must exist a substantive right apart from the jurisdictional statute. *See United States v. Mitchell,* 463 U.S. 206, 216–17, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). Plaintiff argues that the government breached a contract with him when the government either damaged or lost his household goods. Am. Compl. ¶¶ 126–35. To recover for his loss, plaintiff submitted a claim for damages to the Army. Def.'s App. 90–91 (copy of plaintiff's completed and approved DD Form 1842, Loss of or Damage to Personal Property Incident to Service). This form recites that its authority for payment on claims is founded upon 31 U.S.C. § 3721, or the MPCECA. *Id.* at 91. Hence, the MPCECA applies to

plaintiff's claim for damaged or lost household goods. As noted above, the MPCECA provides that settlement of a claim by the military is "final and conclusive." 31 U.S.C. § 3721(k). Therefore, pursuant to well-established precedent, this court does not have jurisdiction to review disallowance of a claim by the military under the MPCECA. *Merrifield,* 14 Cl.Ct. at 184–185; *cf. Collins v. United States,* 67 F.3d at 287 (noting that the MCA and the MPCECA have identical language regarding finality of a settlement).[50]

Assuming *arguendo* that the MPCECA is subject to judicial review, this court lacks jurisdiction because the MPCECA is not a money-mandating statute. *Merrifield,* 14 Cl. Ct. at 184. The MPCECA provides that the "head of an agency may settle and pay not more than $40,000 for a claim against the Government." 31 U.S.C. § 3721; *cf. Collins,* 67 F.3d at 286 (stating that "may" in the MCA, 10 U.S.C. § 2733(a), gives the Secretary the discretion to settle claims). Discretionary authority "does not give rise to a claim of money damages against the United States." *Holder v. Dep't. of the Army,* 229 Ct.Cl. 417, 422, 670 F.2d 1007 (1982). Plaintiff fails to cite to any provision that requires the payment of money. Indeed, Federal Circuit precedent makes clear that he cannot.

In his request for discovery pursuant to RCFC 56(f), plaintiff specifically states that a deposition of Major Ohlweiler would determine if Major Ohlweiler used his "influence" to instruct the moving contractors "to unpack items from crates and repack prior to delivery." Pl.'s Mot. 16. Plaintiff, however, fails to explain how the discovery he seeks will raise a factual dispute to rebut defendant's legal contention—that this court does not have jurisdiction over plaintiff's household goods claim. Indeed, plaintiff cannot. As the Federal Circuit explained in *Florsheim Shoe Co. v. United States,* where all the issues raised in a motion to dismiss are questions of law, "factual discovery is not necessary or appropriate." 744 F.2d 787, 797 (1984). Similarly, in the case *sub judice,* the issues raised in defendant's motion for sum-

---

**50.** While the MPCECA applies to plaintiff's claim, it is instructive to refer to both the MCA and the MPCECA because of the similar language in both acts as noted above.

mary judgment are questions of law. For that reason, plaintiff is unable to demonstrate that the discovery he seeks will rebut the purely legal arguments raised by the defendant's dispositive motion. Therefore, plaintiff is not entitled to discovery, and defendant is entitled to summary judgment on plaintiff's breach of contract claim for household goods, Count VI of plaintiff's amended complaint.

## IV. CONCLUSION

For the reasons stated above:

1. Plaintiff's Motion for Discovery is **DENIED.**

2. The court **GRANTS** defendant's Motion for Summary Judgment on Counts V and VI of plaintiff's amended complaint.

3. Plaintiff shall file his response to defendant's Motion to Dismiss or in the Alternative, for Judgment on the Administrative Record with respect to Counts I–IV of the amended complaint, **no later than Monday, April 2, 2007.**

4. Defendant shall file a reply in accordance with RCFC 7.2(c), 14 days after service of the response.

**IT IS SO ORDERED.**